Good morning, Judge Southwick, and may it please the Court. Benjamin Aguiñaga here on behalf of Warden Hooper. The last time this case was before the Court, the Court vacated the District Court's grant of habeas relief and remanded so that the District Court could properly apply AEDPA's deferential framework. The question in this appeal is whether the District Court complied when it again granted habeas relief to Petitioner and then ordered the State to release or retry him. With all due respect to the District Court, it did not, and the Court, this Court, should reverse and render for the State for at least two overarching reasons. First, the District Court's decision effectively transforms Petitioner's Brady claim into a Confrontation Clause claim, and that is squarely foreclosed by this Court's decisions in Sepulveda and Barnes. And second, there is no reasonable probability that if Petitioner had possessed the grand jury testimony, the outcome of his trial would have been different. And at the least, under AEDPA, reasonable jurists could disagree on that point, which forecloses habeas relief. JUSTICE KENNEDY. Counsel, did you take a position in your brief panel that heard this and remanded it, did not take a position? Explain to me if this is a look-through case into the Fifth State Circuit Court of Appeals or whether we rely on that one sentence, and whatever it might mean, at least the Supreme Court of Louisiana did tell us what it saw was important. Which way should we go? MR. WHITE. Certainly, Justice Southwick. So I want to be very candid. We have briefing in the District Court where the State took the position that the District Court should look through the Louisiana Supreme Court's decision to the Court of Appeals' decision. As you know, both the magistrate judge and the District Court, at least in its first order, granting habeas relief, held that this was not a look-through case, that this was not a one-word denial from the Louisiana Supreme Court. JUSTICE KENNEDY. It's a one-sentence denial. MR. WHITE. It's one sentence, Your Honor, and, you know, and what the magistrate and the District Court said on that point, at least the District Court the first time around, was that there was sufficient reasoning there such that the — JUSTICE KENNEDY. I mean, sufficient reasoning. We are trying to figure out, it seems to me, whether the reasons that were expressed somewhere in the Louisiana Supreme Court did say at least what it was looking at, that on the merits this wasn't shown, this particular Brady violation was not shown. But beyond that, we have nothing. MR. WHITE. I think that's right, Your Honor, and under the Supreme Court's decision in Wilson, given that you know exactly what the Louisiana Supreme Court was looking at and why it denied the writ application, I think it's incumbent upon the petitioner to supply some hypothetical reasons, to look at all the universe of hypothetical reasons the State Court could have given to deny the Brady claim, to deny the writ application on materiality grounds, and to say there is no reasonable juror or judge to come to the conclusion that the State Court did, the jurists, the jurists of reason, Your Honor. And I think the most compelling factual point on that issue, Your Honor, is that all the way up from the Louisiana Court of Appeals, Louisiana Supreme Court, even the magistrate judge in this case, there are jurists of reason on both sides of the issues that are presented to you on appeal. Jurists have come out our way, the majority of the Louisiana Court of Appeals, the majority of the Louisiana Supreme Court, and the magistrate judge in our case looked at the exact same record and said, no, at least under the Brady materiality standard and, as a magistrate judge said, applying AEDPA's framework, there is no way that the petitioner has come close to carrying his burden to show a reasonable probability that but for the withholding of the grand jury testimony, the result in his trial would have been different. And, Your Honors, I, you know, we can look, I'm happy to talk about any aspect of the grand jury testimony. I think there are a number of claims and theories in petitioner's. Why didn't y'all give that to him sooner? I mean, this has been like 30 years or something that all of this is going on. Why didn't y'all give that sooner than you did? So, Your Honor, my understanding from the record is that the State at one point took the position that it may have been lost. It's not clear to me whether that belief was due to a hurricane like Katrina or something else. I do know, and what I can tell you from the record in this case and before the district court below, is that when the district judge held an evidentiary hearing where this Brady issue first came up, this is around 2014, 2015, what the district court said, and you can look at the testimony, this is ROA 3140 to ROA 3145. This is the State Court's custodian testifying to the grand jury testimony, and what he told the district court was, I brought the full record to this court. We have not turned over the grand jury transcript because Louisiana has specific laws governing the disclosure of sensitive information in grand jury proceedings. And so that was the reason that the custodian test, pardon me, Your Honor? Was that being stated what year? The hearing itself was around 2014, Your Honor. And this is before, and so what happened, just to give you some of the timeline here, at that hearing, the State's custodian testified, I have the grand jury transcript. We've not turned it over because of Louisiana law. At that point, Petitioner's counsel asked the district court to review the transcript in camera to determine if there's anything that should be disclosed to him. The district court thereafter did that, and that's when the district court entered a redacted version of the grand jury transcript on the record. And so if you look at ROA 2547 to ROA 2563, this is the district court's order after she reviewed the grand jury trial, the grand jury transcript, and she gave her reason. She recognized, as the State's custodian did, that Louisiana law ordinarily bars the disclosure of this kind of testimony. But she said there are certain exceptions to apply, and that's why she released a redacted version on the record. When you said bars disclosure of this kind of testimony, what do you mean kind? What kind of testimony? Grand jury testimony? Grand jury testimony, yes, Your Honor. Yeah, her view was that she had identified Brady material and her construction of Louisiana law was that that enabled her to disclose testimony that otherwise was required to be withheld or not disclosed publicly under Louisiana law. So that's the history of how the transcript came to be in the record. At that point, that's when Petitioner went back to state court at the district court's instruction to exhaust any potential Brady claims. And then that whole process runs its course, then we get back to federal court. Well, and that's kind of interesting. Why is it that the district judges all rule for your opponent and the appellate judges so far? Now, obviously, we don't know what we'll do, but the appellate judges so far have all ruled for you. What is causing that? Your Honor, I can't speculate to what's causing it. I can tell you the magistrate judge issued a 51-page order back in 2020 coming out of our way. Right, but that's why I said district judge. That's correct, Your Honor. District judge in the state court and the district judge in the federal court both agreed that there should be a new trial. But the appellate judges changed that, and I'm asking why. Do you think it's because the magistrate judge was right? Your Honor, I think at least as far as federal court goes, the magistrate judge was right because what the magistrate started its analysis with was a recognition that it was bound by AEDPA's deferential framework. And once you start from that starting point, then the materiality question in this case becomes quite a straightforward one because not only does Petitioner bear the burden of showing materiality, which is a reasonable probability of a different outcome at trial, but he must satisfy his burden at the second layer of the analysis, which is he must show that no jurist of reason could come out the state's way. And that's been our position all along, and I think that's what the magistrate judge recognized. Judge Haynes is, once you apply, once you accept that that framework governs here, Petitioner's burden here is to show that no jurist of reason can come out the state's way. And we know from the magistrate judge's opinion, we know from both courts of appeals and the state courts, that that's simply not true because jurists of reason have come out our way. And so, as I say, I'm happy to talk about any of the nuances of the grand jury testimony, but... Well, I'm wondering, I don't think the law is that if any judge has ever ruled a different way, AEDPA doesn't apply. So, assuming that that's not the case, and I'm well aware of AEDPA and I'm well aware that that is different from de novo, very different, I still think it can sometimes apply. Sometimes we can set aside a denial of habeas in a state court. What would be required here to pull it up, to push it up to where you would not even be contesting it? What's missing here? So what's missing, Your Honor, is what the Supreme Court identified in Weary. This is page 75 of Weary v. Kane, and the Supreme Court says, the petitioner at least has to show a likelihood sufficient to undermine the confidence of the jury's verdict. That's not a de minimis standard. That's still a fairly high standard. And I think that's what petitioners fail to do here, is point you to some theory, some aspect we've reproduced the portions of the grand jury transcript that are at issue here. Some aspect of that transcript that would cause a jurist of reason to think that sufficiently undermines our confidence in the jury's verdict. Most of your argument, factually, is that what was not disclosed to the jury in a specific way was essentially disclosed to the jury in other ways. Is that a fair assessment? In certain respects, that's correct, Your Honor. Where is it not correct? So I think where it is correct, I'm going to kind of reason backwards, where it is correct is, for example, the — I think, candidly, petitioner's strongest theory is this idea that the grand jury transcript shows Temple supposedly identifying a man matching Derrick Hudson's description as the shooter. I think that's probably his strongest theory. The reason that theory doesn't work is that his match, this match theory, there was no description of Derrick Hudson at trial. There was no witness testimony, no evidence that told the jury this is what Derrick Hudson looked like in war on the day of the murder. The only reason that theory works, as petitioner sees it, is because he's relying on evidence that was not disclosed to the jury, but that he had in his possession. That's the Moses Statement. Sherman Moses' pretrial statement gives a description of Derrick Hudson that petitioner's response brief uses to try to match to what Michelle Temple testified at trial. You don't think a reasonable view of Temple's testimony could place Hudson with a gun in his hand next to the victim right after the shooting? No, Your Honor, and I'm glad you asked that question because I think that is a core part of the case that gets lost in the response brief, which is the only thing that plausibly ties Hudson to Michelle Temple's grand jury testimony is Sergeant Snow's trial testimony. She testifies that she showed Michelle Temple a lineup, including a photograph of Derrick Hudson. I think it would be an exceedingly irrational juror that would then reject the next part of that testimony where Sergeant Snow says she actually didn't identify anyone in the lineup. That is the only link between what the trial jury heard and saw to the grand jury transcript. And that's why I think for all of petitioner's arguments in that section, and as I say, I think that's probably his strongest theory of the case, once you accept all of that colloquy in the grand jury transcript where Michelle Temple says she identified somebody in a lineup, she saw the shooter, she didn't see the shooter, the only way the trial jury could say, oh, that's Derrick Hudson, is the fact that Sergeant Snow testified at trial that she gave a photographic lineup, including Hudson, to Michelle Temple. Well, obviously, the person that does the shooting is a murderer, but often there are people involved in assisting in the shooting who are also part of the situation. And so I'm wondering why didn't they file a case against Hudson? They said they were going to, and then they didn't. The sergeant said she was going to, and then she didn't. I know she was pregnant and all that, and I respect that, but that doesn't last forever, and this has been 30 years, so why didn't they pursue Hudson if Hudson was part of the murder? Your Honor, and the candid answer I have is I don't know. What I can tell you is what the record shows, which is one, as you noted, was Sergeant Snow's own testimony here in post-conviction proceedings where Sergeant Snow gave all of these reasons, her personal reasons why she was no longer in the office or on the case. We do know from the trial transcript, this is ROA 1117, she told the jury, she testified to the jury that she looked for Hudson for four to five months. So the jury was well aware of that. The jury was also well aware from Sherman Moses' testimony, this is 1180 and 1184 of the ROA, they also knew that Hudson had yanked jewelry off of Palmer's neck, the victim's neck, and then robbed him, took the money, before Petitioner shot the victim. The trial jury heard all of that. And so I think the question you have in your mind, Judge Haynes, is exactly the question that the trial jury already had in its mind given the testimony that had come out at trial. And I think the thing I would add on to that, Judge Haynes, is the fact that when you go down this road of, well, what did the jury think or know about Hudson's own potential criminal liability, remember that the state trial court held an extensive hearing on this question, whether Petitioner's defense counsel could go into a line of questioning about Hudson's motivations for testifying, whether there was a deal in the works or some sort of favorable treatment. And we know, and this was affirmed by the state appeals court on direct review, that the state trial court refused to allow Petitioner's counsel to go down that road. And so, Judge Haynes, even if you thought that potentially there was something that could be gained by admitting this grand jury testimony where Sergeant Snow says, yes, I intended to arrest him, we know from the record that Petitioner's counsel could have never gotten that out at trial because the state trial court already rejected it. I see my red lights. So, is there any evidence that Hudson was charged with something else, an unrelated crime? Was he incarcerated? Has he been incarcerated? Is that in the evidence? Your Honor, my understanding is that he was incarcerated at the time that he testified. The state trial court didn't allow a testimony about that. He was on unrelated charges is what something in the record says. That's correct, Your Honor. Do we know anything more about that? I don't believe the record shows anything regarding his potential liability as to this murder. All right. Thank you. Thank you, Your Honor. Good morning, Your Honor. It's Chris Averly, CJA counsel for Mr. Grace. How many arguments have you made on behalf of this client? On behalf of this client? Well, I've been before this court twice now. As well as the state court, the circuit court. I did not represent him in any state court proceedings. All right, counsel. You can proceed. Speaking of that, Judge Haynes, you mentioned the appellate courts going with the state, but this court hasn't actually gone with the state yet. The first appeal was when they argued that— Well, but they didn't not go because they sent it back. They didn't affirm it. Correct. So that's what I meant. Right. And the court could have reversed outright, you know, if it had wanted to. Not sure where to begin. If the court has any questions, I can start there. Otherwise— Well, I mean, I think if this were de novo review, it might be a really easy case, but it's AEDPA. Yes. So you're well aware of AEDPA, which is pretty high up there, so climbing that mountain takes a lot of walking. So tell me how you get up to the top of that mountain. Well, there's two parts. First of all, there's the nature of the suppressed evidence. And there's two main parts to this evidence. The first is the exculpatory part, which the state downplays, and I don't even understand how they don't see that a jury could infer from the grand jury testimony of Michelle Temple, who said, I saw this shooting. She qualified it a little bit, said, well, I saw the guy holding the gun to his head when he was on the ground. She said, I picked that man out of a lineup. Judge Sergeant Snow said, I showed him a lineup. It had a picture of Hudson in it. I didn't show a picture of Jesse Grace. Michelle Temple describes—and this I want to clarify with the state—in the trial, Michelle Temple refers to a man kneeling next to the victim. She doesn't say that he had a gun. In fact, she kind of says, I don't know, contrary to her grand jury testimony. And she describes the man that could only be Derek Hudson. Even Sergeant Snow admitted that in the post-conviction hearing. It had to be Snow. It couldn't be Jesse Grace. Now, there are reasons, as the state says, that a jury might, you know— You mean it had to be Hudson? I'm sorry? You're saying the person had to be Hudson? Yeah. Okay. There might be reasons— But Temple has flopped around so much, it's really kind of—I don't even understand that, because this guy, Grace, should matter to her, but she keeps seeming to change what she says, so I'm just— Well, I don't think it's changed a lot, but it's changed significantly. And I'm talking about numbers of times. And does this—first of all, the jury, it's for the jury to decide what to make of this evidence. As I was getting ready to say, the state keeps picking it apart. Well, you know, the jury could have done this, the jury could have done that, but that's not the question. Weary says we don't look at it that way. We don't find all the reasons the jury could have disregarded it, we just look at whether the jury could have reached the conclusion. And I don't see how you can say a jury wouldn't be curious as to how that description of the guy she described at trial isn't the guy with the gun. And one step further, the man who shot Mr. Palmer, it's not, as the state has called it, a mind-bending exercise. It's quite simple. And, of course, there's the other testimony, the other—the excalatory part regarding the, you know, Sergeant Snow saying from her investigation she regarded Hudson as a murderer, going to charge him with first-degree murder. She tells the jury that the only reason why she showed Hudson's photo to Michelle Temple because she—I'd like to quote that one—she, on a first-name basis, she says because Derek was listed as one of the witnesses to the incident. That's all. She says that to the jury when we know that when she—clearly she showed the photo because she thought he was a principal to the crime, as she told the grand jury. And then she says, oh, well, we've finally caught up with him, she tells the jury, well, I confirmed that he was, quote, on the scene. So something's going on here. Michelle Temple is not fingering Hudson like she was in a grand jury testimony. Neither is Sergeant Pernia. What's going on? The jury should know. I wonder what the Fifth Circuit Court said about that in 2017. Temple has given several inconsistent statements, grand jury proceedings, trial. State sets out what those are in its brief on whether she saw the shooting, whether she heard the shots, whether she saw a gun to the victim's head, and goes through other inconsistencies. Regardless of whether she possibly identified Hudson as the perpetrator, her grand jury testimony also placed the defendant at the scene with a gun. Is any of that incorrect, or would you just weigh it differently? You were quoting the— Fifth Circuit Court of—State Fifth Circuit Court in 2017. Oh, okay. Yeah. It's far from clear that she—that the amalgam of her statements puts Jesse Grace at the scene at all. I mean, there's so many of these situations, I don't get them straight. But— Are you saying you cannot read Temple's testimony ever to replace grand jury defendant at the scene holding a gun? Oh, you can. Oh, can you read it for that, that he's holding the gun? Yes. Yes, there is one way you could read it, and that is—that relates to the grand jury testimony when she describes the person holding the gun, blah, blah, blah, I'm sure this is the guy who shot him, and that's when the prosecutor says, so you saw Jesse Grace holding the gun. That's where the state hangs its hat, that, oh, it was Jesse Grace, it wasn't Derek Hudson. But as I've really tried to hammer down in my brief, there is a very good reason for the judge to—for the jury to conclude that it wasn't Jesse Grace. The name Jesse Grace was just thrown at her by the DA. She testified at trial, she didn't know any of those people. She didn't know them or their names. So when she's describing somebody that she—whose name she doesn't know, who looks like Derek Hudson, and the prosecutor says, so you saw him holding the gun? You saw Jesse Grace hold the gun? She just gives a yes because she's assuming that the prosecutor knows what he's talking about. That fact alone can't defeat this claim because it's— But why would the state want it to be Grace and not Hudson? Neither of these people are popular in the city or something like that. I mean, I don't understand that. It would seem like police officers, prosecutors, all of those people want to find the right person or charge all of the people that might be involved. Right. Okay. But they didn't find him because he ran away. They lost— Okay, but like I said, this has been 30 years. They did find him and he was in prison, right? So he was available. He was available. And so I guess I'm just a bit confused about the notion that they would like make it up and let's just make it Grace and forget Hudson. I don't understand why that would happen. Well, how about they could put Grace away if they got Hudson to put him away? I mean, this is the whole idea behind the favorable treatment. If Hudson is the one who was the murderer, why would they rather just pretend it was Grace? That just makes no sense to me when we're talking about police officers and prosecutors and people that should be high in ethics. My response to that is C. Kyles v. Whitney, C. Weary v. Cain, C. Smith v. Cain. The same thing happened in those cases. There was no excuse for what the prosecutors did in those So it can happen. Perhaps it's a convenience factor. You've got Jesse Grace. All you need is a witness to put him away. I don't know. The jury could decide whether there was a winker or not or a statement made to him, you know, we got you in jail. We could put you away for murder. So this whole notion that the state court says there's no evidence of a deal just because there wasn't a written deal or just because the prosecutor said, well, we didn't give him a deal, to me, it's just defied by the very facts that you are mentioning, that he testifies. The jury had to wonder why the state thought he was a murderer at one time and treated him as a bystander. They have to know why that change would happen. And because there's no good reason for that ever comes out, the suggestion that he was given special treatment is undeniable. I don't know if you wanted to, I wanted to address the state, the state really goes into this notion that we, what we've done is raise a confrontation clause claim disguised as a Brady claim. That's just misguided, misdirected. The birth of that argument comes from the fact that the court cites Davis versus Alaska. But Mr. Grace's Brady claim is a straight up run of the mill garden variety case of the suppression of statements by witnesses that are both impeaching and exculpatory. It's a Brady claim. The only reason why the state court mentions Davis is because it's responding to the state courts, the district court mentioned, because the state court was responding to the notion that if you don't have a deal, there's no evidence of an actual deal, then there is no, the favorability of special treatment, there's just not material. I mean, I don't have to say that quite as well as I want to, but evidence of favorable treatment is not material unless there's a deal. And we have evidence of favorable treatment. Davis says no, you don't have to have a deal. So if Davis didn't exist, it would not be needed to provide the clearly established federal constitutional law that supports the claim that the state suppressed exculpatory and impeachment evidence. It's not related. Therefore, this notion that we've tried to raise a confrontation clause disguised as a Brady claim just doesn't hold water. So you're saying the state court relied on Davis or it didn't because it didn't need to? We're saying that the, well, the state court didn't rely on Davis. The state court ignored Davis in making that statement that, you know, hey, there's no deal, so there's no evidence of special. You can't have evidence of special treatment if you don't have a deal. And there's no deal in this case. And the conclusion that there was no deal was based on the fact that the defendant said no, there's no deal, and the prosecutor said no, there's no deal. But, of course, the defendant should have been given the opportunity to present evidence from which the jury could infer, contrary to those representations, that there was, in fact, a deal or an understanding. And in any case — You think it's a whisper deal, not a written deal. Oh, there's — I have no reason to think there was a written deal. Okay. But why in the world do you have this person testifying against a person who's — we know the state thinks he's guilty, and he's testifying. He gets away with it. Well, a defendant could think, if I do this, maybe I'll get something helpful. But that doesn't mean he has a deal or even a little whisper. It just means, okay, let me try. Why not? Because I — Grace did something — I mean, the story of what happened is kind of bizarre about the shooting even after he — the victim turned over the money and everything. So I don't really understand the — not that I'm saying there's ever a good reason for a murder, but it's just — it's a — the whole thing is kind of — doesn't make sense. So maybe Hudson thought that, too, and, oh, let me just push this on Grace and go after him, and hopefully that'll help me. Sure. And if he thought that, that's okay. That doesn't mean there's a deal. No. But the point isn't whether there's a deal. The point is whether — because the jury didn't know that the state thought, through their investigation, believed him to be a murderer. They had to wonder why he wasn't being charged. And that raises the inference that the state partook of special treatment. They did, though. I mean, the man got to leave. They let a murderer go free. They never say, oh, well, maybe he didn't do it. They never say that. What we're looking at is the effect on the jury. The jury did hear some testimony, Moses, for example, saying Hudson was part of that activity that led to the shooting. What is different, really, when we're looking at this through the output lens, when we're looking at material effect, what is different from what you're saying needed to have happened and what did actually happen? The jury did have in front of it that Hudson potentially was involved in this as well. And all they had to decide was Grace involved. They didn't have to decide whether Hudson was going free or not. Nothing — nobody told them Hudson's not ever going to be charged with this, did they? I mean, the jury wasn't told this guy's free and clear. He's going to walk on this. All they knew is he wasn't being prosecuted in this trial. Well, first of all, I think the jury was — No, that was kind of a question. Is that true? No, I think — They were never told that he's never going to be prosecuted for this, but he is a witness in this trial for something he may also have been involved with. Right. And if you read the trial transcript, the State goes out of its way to make the jury think that Hudson was a mere bystander, even though you've got Sherman Moses putting a — had to have a problem with Mr. Moses. Mr. Moses had — the jury did know that Mr. Moses was accused of this crime. The jury did know that Mr. Moses smoked nine joints before trial. Of course, the jury didn't know that he lied to the jury by saying he had originally — well, I won't go into that because I don't want to irritate the State again. But both of those witnesses gave statements prior to trial. They're in the jury that they had actually not seen the shooting. Of course, the jury didn't know that. But anyway, so knowing that the State was going to — had intended to arrest him for first-degree murder, not knowing that the State did that and not seeing a reason why at trial puts this case in a different light. And that's one of the — that's the standard for materiality. And then on top of all that, you don't have to have a lot in this case. You've got two witnesses, one whose credibility is the subject of some of this suppressed evidence, and one who, I explain, has serious problems to begin with. That's the evidence. There's no corroboration. The State tries to argue there is. There isn't. It's — the guilt turns solely, 100 percent, on the jury's assessment of their credibility. So between Temple's seemingly identifying Hudson and Sergeant Snow's revelation that she was going to arrest this guy for murder, you don't think that's much. It's enough to create a reasonable probability that if this matter had been disclosed, there would have been a different outcome. All right, Counsel. Thank you. Thank you, Judge Southwick. Just four brief points on rebuttal. First, Judge Haynes, on this question of why wasn't Hudson charged, I think the easiest way to grapple with that issue is suppose Hudson had been charged in this crime. The State trial court would not have let defendants' counsel question him about it. We know that. That's open and shut. Look at ROA 1153. That's the summation, State trial court's summation of the hearing on this issue about any favorable treatment from the State. And so I think that's the easy way in and out of that whole issue is suppose he'd been charged, defendants' counsel still couldn't have asked him anything about that. Second, my friend on the other side said that Sergeant Snow admitted that Michelle Temple had to have identified Hudson. I want to be very clear, because Judge Graves, this goes back to our earlier colloquy on what is the match, the supposed match between what happened at trial and what Michelle Temple described in the grand jury transcript. Look at our reply brief at pages 21 and 22, footnote 4, because we give you there the citations that Petitioner offers for this supposed match. They're trying to create a trial testimony in which she describes to someone kneeling by the victim on the ground. And then on the other hand, they're matching Sherman Moses' unadmitted statement where he describes what Derek Hudson supposedly looked like and was wearing the day of the murder. That's the match they're selling to this court. And respectfully, that is highly improper, because that statement was not admitted at trial, and the jury would have never drawn any inference from it, because they had no idea what Sherman Moses. When did Moses make that unadmitted statement? It was before trial, Your Honor. I don't have the exact timing on whether it was, I think it was a few days. That jury is not trial, but there was some other point he made that description? That's correct, Your Honor. I want to say, and don't quote me on this, I want to say it was shortly after the actual murder and not right before trial. But there's no question, and we give this to you in the reply brief, there's no question that Petitioner's counsel had that statement and never questioned, could not try to admit it, tried to impeach him on it, was unable to do so. The third point, Judge Southwick, you asked my friend, is it possible to read the grand jury transcript as suggesting that Michelle Temple placed Jesse Grace at the scene of the crime holding a gun to the victim's head? And I think the answer is absolutely yes, and the best evidence of that is this was the district court's own view of the grand jury transcript. Look at ROA 2555. This is when the district court came up with the Brady suggestion in the first place, and what the district court says, quote, Temple testified she actually saw the shooting, that she could identify the Petitioner as the man who shot Palmer, that she saw Petitioner holding a gun to Palmer's head, and that she identified Petitioner in a lineup. That was the district court's own reading of the grand jury transcript the first time she saw this. And so respectfully, absolutely, the answer to your question is yes, the grand jury transcript can be read to suggest that Michelle Temple placed Petitioner at the crime scene. The last and final thing I want to leave you with is the Confrontation Clause issue. Our claim is not, our position here is not that Petitioner intentionally framed this as a Confrontation Clause claim dressed up as a Brady claim. Our position is that if you read the district court's decision, and specifically look at ROA 3118, where the district court sums up everything it says about impeachment and witness credibility, from top to bottom that analysis is about Davis v. Alaska and its progeny. And what Judge Higginson's opinion for this court in Sepulveda says, this is footnote one of Sepulveda, he says there that a Confrontation Clause claim based on the nondisclosure of impeachment evidence is not cognizable. That's this court's holding in Sepulveda. And so if I could urge the court to place side-by-side footnote one in Sepulveda, and on the other hand, the district court's decision in this case, it's top to bottom a Confrontation Clause decision. And what this court said in Sepulveda is that kind of claim is not cognizable. And so I think that's a separate legal error. You don't have to reach it, but that's an additional reason why this court should reverse and render for the state. If the court has no further questions, we ask you to reverse. All right, counsel. Thanks to you both for your assistance in helping us understand this case. It's been here twice already. We'll see what we can do to resolve the current version of it. This panel is adjourned.